**BRONX TOWING LINE, Inc. v. CONTINENTAL INS. CO.**

No. 19674.

United States District Court
E. D. New York.

July 9, 1952.

Foley & Martin, New York City (Christopher E. Heckman, New York City, advocate), for libelant.

Kirlin, Campbell & Keating, New York City (John H. Hanrahan, Jr., New York City, advocate), for respondent.

KENNEDY, District Judge.

Libelant seeks to recover $6,000 on one cause of action and $250 on a second cause of action under a policy of insurance issued by respondent. While I was at motion term libelant brought on exceptions to the 11th article of respondent's answer. In the course of the argument both advocates agreed that there was no real issue of fact anywhere in the case. I then suggested that a stipulation be made, and that on this basis I would proceed to consider and decide the case on the merits.

The stipulation shows that on May 28, 1947, respondent issued to libelant its protection and indemnity policy insuring against described liabilities that might arise in connection with the operation of certain tugs, among them the tug Frank P. Buchanan. One of the listed risks covered by the policy is liability for loss of or damage to any other vessel or craft, provided the loss be neither caused by collision or arise under a contract.

On April 24, 1948, Frank P. Buchanan picked up the scow G. G. No. 194 from a stakeboat off Liberty Island and towed her to Shooters Island Wharfage Piers in the Kill Van Kull, near Newark Bay. Buchanan placed the scow at a berth at approximately 6:30 P. M. At 2:00 A. M. on April 25, 1948, the scow sustained damage in the berth in which Buchanan had placed her. This damage occurred while Buchanan was actually towing another vessel in a different area.

The owners of the scow thereupon instituted suit against one James J. Murray and the tug Frank P. Buchanan, demanding damages in the amount of $14,000. In that libel it was alleged that the damage sustained by the scow was caused by the fault of Buchanan. Respondent was notified by libelant that the suit had been commenced, but disclaimed liability under the policy. Later libelant asked respondent to approve or disapprove settlement of the suit for the sum of $6,000, but respondent reiterated its denial of coverage and advised libelant to proceed as a prudent uninsured. Libelant thereupon settled the suit for the sum of $6,000 which it now seeks to recover (in the first count of the libel) and in connection with that scow suit libelant claims that it sustained reasonable legal expense in the amount of $250 which it also seeks to recover (under the second count).

There is no suggestion anywhere that there was any independent intervening cause of damage to the scow, and no question that the proximate cause of the scow's damage was the negligence of the tug in providing an unsafe berth.

The reason respondent has disclaimed coverage is that the policy sued upon contains a specific provision that no liability shall attach for any loss, damage or expense which would be payable under the terms of the Tug Syndicate's standard form of tower's liability insurance. In other words, the protection and indemnity policy excludes from its coverage any loss which would have been covered by a standard Tug Syndicate's form of insurance. The position, therefore, is that if libelant would have been protected by a tower's liability policy it cannot recover against respondent, because the policy here sued upon says so.

Would a Tug Syndicate's policy have covered the damage to the scow under the facts set forth above? That form of policy provides, among other things, that the assured will be paid if any vessel which it owns "shall cause any other loss or damage to her tow or to the freight thereof or to the property on board". Libelant seems to concede that if the damage had occurred at the instant the scow was placed in the berth, then it would have no claim

against respondent under the protection and indemnity policy. But libelant says that some eight hours elapsed between the time the scow was placed in the berth and the time the damage occurred, and this being so the scow no longer came within the meaning of the words "her tow". Libelant argues with considerable ingenuity that once a tug has berthed the vessel which she is towing it would be an absurdity to refer any longer to that vessel as being a "tow", because if that were so one tug might have innumerable "tows" scattered around the harbor, although she was not actually in the process of "towing" any one of them. And to fortify this argument libelant emphasizes that at the time the damage was sustained by the scow G. G. No. 194, its tug Buchanan was actually towing another craft elsewhere.

But plausible as this argument is I think I must reject it. The problem is not one of word-color but of insurance coverage. It would, I think, be absurd to say that the Tug Syndicate's policy has spent its force the minute the "tow" is moored. If the tug has set up a chain of causation which results in damage even after she has physically left the berth, I suppose no one who has bought and paid for this type of insurance would have any patience with a claim by the issuing company that there is no coverage except during actual towage—I am sure the libelant, if it had had such insurance, would reject that view. To me the intention of the tower's liability policy is perfectly clear, and I believe the issuing company would have been liable to the libelant under the circumstances which the stipulation discloses. It is unnecessary for me to say anything concerning the effect on the policy of time-lapse after the tow has been moored. The question, I should think, is always one of causation and naturally in most instances a long time-lapse would have the effect of weakening the claim of causation and exonerating the tower.

I wish again to make clear that neither in the papers nor in the oral discussion before me has there been any claim that the damage to the scow was caused by anything other than the fact that the tug gave her a bad berth.

The libel is dismissed without costs.